IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| SHAWN H. RAY, GABRIEL M. STEWART, LORI POULSEN, JAMES DALLIN, DEREK HOLT, and ERIC HUNTER,<br><br>          Plaintiffs,<br><br><br><br>          vs.<br><br><br><br>WAL-MART STORES, INC.,<br><br>          Defendant. | MEMORANDUM DECISION AND ORDER<br><br><br><br><br><br>Case No. 1:11-cv-104 |

This litigation arises out of three different events involving altercations between customers and employees of Defendant Wal-Mart Stores, Inc.  The Plaintiffs, former employees of Wal-Mart who were fired in response to their handling of these incidents, allege that they were wrongfully terminated in violation of their employment contracts with Wal-Mart and in violation of their right to self-defense.  Wal-Mart moves the court to enter summary judgment in its favor on these issues.  For the reasons stated below, Wal-Mart's motion is GRANTED IN PART and DENIED IN PART.  The court agrees with Wal-Mart that the Plaintiffs were not fired in violation of their employment contracts.  But the court finds that the question of whether Utah law allows the Plaintiffs to pursue an action for wrongful termination in violation of their right to self-defense is one that is most appropriately answered by the Utah courts.  Accordingly, the court certifies this question to the Utah Supreme Court.

FACTUAL BACKGROUND

Each of the six Plaintiffs in this lawsuit was involved in one of three separate incidents that occurred in Wal-Mart stores located in the Utah cities of Layton, West Valley City, and Cedar Hills.

## I.      The Incident at the Layton Wal-Mart on January 13, 2011

Plaintiffs Shawn Ray, Lori Poulsen, and Gabriel Stewart were all employees of Wal-Mart Store #1699 in Layton, Utah.  Mr. Ray was an Asset Protection Associate (APA)[1] who was hired in 2008.  Ms. Poulsen was an Asset Protection Coordinator (APC)[2] who was hired in 2003.  Mr. Stewart was an Assistant Store Manager who had been employed since 1998.

On January 13, 2011, these three Plaintiffs were involved in an incident with Trent Longton, a customer who was attempting to steal a laptop computer by concealing it in his pants. According to Wal-Mart, multiple APAs confronted Mr. Longton.  (Wal-Mart Case Record 1/13/11, Def.'s Mem. in Supp., Ex. 5, Dkt. No. 65.)  A group of five of these employees, including Mr. Ray and Ms. Poulsen, escorted Mr. Longton to the asset protection office at the front of the store, where they were joined by Mr. Stewart.  (*Id.*)  The Plaintiffs dispute Wal-Mart's use of the word "confronted."  They submit that Mr. Longton was initially cooperative with the APAs, but agree that he was taken to the asset protection office.  (Ray Dep. 84-85, 216; Poulsen Dep. 53.)

According to Wal-Mart, the following events occurred once Mr. Longton was inside the

---

[1]Wal-Mart APAs investigate, document, and, in certain limited situations, prevent theft of store merchandise by customers and employees.  (Ray Dep. 47-48.)

[2]Wal-Mart APCs oversee inventory loss, safety, and apprehensions.  (Poulsen Dep. 23-24.)

office.  First, Mr. Longton took the laptop out of his pants and placed it on the office desk.  (Wal-Mart Case Record 1/13/11.)  He then stated, "You have your laptop, I am now going to leave, and I have something I am not supposed to have."  (*Id.*)  Even though Mr. Poulsen observed Mr. Longton move a gun from around his back to his coat pocket, Mr. Poulsen and three other employees (Ms. Poulsen, Mr. Stewart, and an APA who is not involved in this lawsuit) grabbed the gun away from Mr. Longton and pinned him against the wall.  (*Id.*)  Meanwhile, another APA called 911, and police officers from the Layton City Police Department arrived within minutes to arrest Mr. Longton.  (*Id.*)

The Plaintiffs agree that the general sequence of events occurred as stated above, but they dispute that Mr. Longton said that he was going to leave.  (Ray Dep. 106, 187; Poulsen Dep. 74-75.)  The Plaintiffs also emphasize that they were unable to safely withdraw or otherwise disengage from Mr. Longton because they were in a closed room.  (Ray Aff. ¶ 39; Poulsen Aff. ¶ 39; Stewart Aff. ¶ 41.)  The Plaintiffs testified that they never prevented Mr. Longton from leaving the office after he pulled his gun and that Mr. Longton could have left if he wanted to. (Ray Dep. 186; Poulsen Dep. 92-94; Stewart Dep. 78-81.)  At one point, Mr. Longton allegedly had his hand on the door handle but failed to open it, at which point he turned back into the room and pushed Mr. Stewart against the wall, thrusting the gun into Mr. Stewart's back.  (Ray Dep. 186-87; Stewart Dep. 78-81.)  During the incident, Mr. Ray stated that he began audibly praying, "Just leave, just leave, just leave[.]"  (Ray Dep. 88.)  Mr. Stewart testified that he was "frozen in fear," (Stewart Dep. 79) and Ms. Poulsen stated that she had no time "to pause and stop and rationally think."  (Poulsen Dep. 89.)

After the incident, Wal-Mart conducted an internal investigation and terminated Mr. Ray,

Ms. Poulsen, and Mr. Stewart as a result of that investigation.  Wal-Mart claims that the

Plaintiffs violated Wal-Mart's Policy AP-09, which states:

> If the Suspect is believed to possess a weapon, the Suspect must not be
> approached.  If during an approach or investigation, it becomes apparent that the
> Suspect has a weapon or brandishes or threatens use of a weapon, all associates
> must disengage from the situation, withdraw to a safe position, and contact law
> enforcement.
>
> If at any point the Suspect or any other [sic] involved becomes violent, disengage
> from the confrontation, withdraw to a safe position and contact law enforcement.

(Def.'s Mem in Supp., Ex. 9, at 3, Dkt. No. 65.)

The Plaintiffs testified that they did not believe they would be terminated as a result of

the encounter with Mr. Longton.  Instead, they thought that they might be asked to participate in

Wal-Mart's Coaching for Improvement program, since coaching was a common practice that

Wal-Mart employed after various employee incidents.  (*See, e.g.*, Ray Aff. ¶¶ 9-11.)  The

Plaintiffs claim they understood that Wal-Mart could fire them only for gross misconduct as long

as they cooperated with coaching.  (Ray Aff. ¶ 16; Poulsen Aff. ¶ 15; Stewart Aff. ¶ 13.)  On the

Plaintiffs' exit interview forms, Wal-Mart stated that it was firing Mr. Ray, Ms. Poulsen, and Mr.

Stewart for "Inability to Perform Job."  (Ray, Poulsen, and Stewart Exit Interviews, Pls.' Mem.

in Opp'n, Ex. 13, Dkt. No. 93.)

## II.    The Incident at the West Valley City Wal-Mart on December 24, 2010

Plaintiffs Derek Holt and Eric Hunter were both employees of Wal-Mart Store #3568 in

West Valley City, Utah.  Mr. Holt was an APC who was originally hired in 2005.  Mr. Hunter

was an APA who had been employed since 1999.

On December 24, 2010, these two Plaintiffs were involved in an incident with Maryanne

4

Harrison, a customer who was attempting to shoplift various items that totaled about $40 in value.  (Wal-Mart Case Record 12/24/10, Def.'s Mem. in Supp., Ex. 12, Dkt. No. 65.)  According to Wal-Mart, Mr. Holt and a number of other employees, including Mr. Hunter, confronted Ms. Harrison as she was about to leave the store.  (*Id.*)  Ms. Harrison tried to run away, but Mr. Holt and Mr. Hunter grabbed her arms.  During the struggle that followed, Ms. Harrison pulled out a small pocketknife and yelled that she would stab them if they did not let her go.  (*Id.*)  Mr. Holt and Mr. Hunter maintained their hold and, with the assistance of a customer, were able to pry the knife out of Ms. Harrison's hand and take her into the store's asset protection office.  (*Id.*)  One of the APAs who was at the scene but not involved with the struggle called 911, and police officers from the West Valley City Police Department arrived within minutes and arrested Ms. Harrison.  (*Id.*)

The Plaintiffs emphasize that they were already in contact with Ms. Harrison when they became aware that she had a knife.  (Holt Dep. 14; Hunter Dep. 10.)  Mr. Hunter did not notice what was going on until he heard a customer yelling that Ms. Harrison had a knife.  (Hunter Dep. 11.)  Mr. Hunter testified that Ms. Harrison was trying to stick the knife into Mr. Holt's neck.  (*Id.* at 10.)  Mr. Holt stated that he "wasn't going to let go, obviously" once he realized that Ms. Harrison had a knife to his back.  (Holt Dep. 14.)  Mr. Holt saw someone come and grab the knife out of Ms. Harrison's hands, but did not realize it was a customer until later.  (*Id.* at 15.)  Both Mr. Hunter and Mr. Holt testified that everything happened extremely quickly.  (Holt Dep. 15; Hunter Dep. 11.)

After the incident, Wal-Mart conducted an internal investigation and terminated Mr. Holt and Mr. Hunter as a result of that investigation.  Wal-Mart submits that the Plaintiffs violated

Policy AP-09, which is discussed above.  Like the Plaintiffs involved in the Layton incident, Mr.

Holt and Mr. Hunter claim they understood that they might receive coaching as a result of their

encounter with Ms. Harrison, but believed that they would not be fired except for cause as long

as they participated in the coaching.  (Holt Aff. ¶ 10; Hunter Aff. ¶ 6.)  On the Plaintiffs' exit

interview forms, Wal-Mart stated that it was firing Mr. Holt and Mr. Hunter for "Inability to

Perform Job."  (Holt and Hunter Exit Interviews, Pls.' Mem. in Opp'n, Ex. 13, Dkt. No. 93.)

### III.    The Incident at the Cedar Hills Wal-Mart on November 26, 2010

Plaintiff James Dallin was employed at Wal-Mart Store #4689 in Cedar Hills, Utah.  Mr.

Dallin had been a Wal-Mart employee since 2001, and was working as an oversight Assistant

Store Manager at the time of the incident.  Mr. Dallin supervised an associate named Kjera

Rigotti, who was married to Francisco Rigotti.

On November 26, 2010, Mr. Rigotti came to the Cedar Hills Wal-Mart and pushed Mr.

Dallin, who he believed was having an affair with his wife.  The parties dispute whether Mr.

Dallin was speaking to Ms. Rigotti or a customer at the time that Mr. Rigotti shoved him, but it is

undisputed that Mr. Rigotti grabbed Ms. Rigotti by the arm after pushing Mr. Dallin and took her

down a store aisle.  Mr. Dallin believed that Ms. Rigotti was in danger and went looking for her

to make sure she was okay.  (Dallin Dep. 17, 158.)  Mr. Dallin eventually caught up with the pair

after a few minutes and shoved Mr. Rigotti into some store shelving.  (*Id.* at 20.)  Mr. Dallin

testified that he wanted to get Mr. Rigotti's attention so that Mr. Rigotti would understand that

the way he was treating his wife was not acceptable.  (*Id.*)  Mr. Dallin then escorted Mr. Rigotti

out of the store.  (*Id.* at 22.)

After the incident, Wal-Mart conducted an internal investigation and terminated Mr.

Dallin as a result of that investigation.  Wal-Mart alleges that Mr. Dallin violated Wal-Mart

Policy PD-48, which states:

> Harassment, violence, threats of violence or other similar conduct is unacceptable
> behavior and is a violation of company policy.  Any associate who violates this
> policy will be disciplined up to and including termination from the company.  Any
> associate who is terminated for violation of this policy will not be eligible for
> rehire.

(Def.'s Mem. in Supp., Ext. 17, Dkt. No. 65.)

According to Mr. Dallin, he was reassured that his "job was safe" by a fellow associate,

Mike Knenvold, following the altercation with Mr. Rigotti.  (Dallin Dep. 239-41.)  Despite these

reassurances, Mr. Knenvold conducted the internal investigation with another employee and

terminated Mr. Dallin.  On Mr. Dallin's exit interview form, Wal-Mart stated that it was firing

Mr. Dallin for "Gross Misconduct."  (Dallin Exit Interview, Pls.' Mem. in Opp'n, Ex. 13, Dkt.

No. 93.)

ANALYSIS

I.      **Standard of Review**

The court grants summary judgment when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court

"view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the

nonmoving party."  *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir.

2008).

II.     **At-Will Employment Law in Utah**

Under Utah law, an employment relationship entered into for an indefinite period of time

is presumed to be at-will, giving rise to a contractual arrangement under which the employer or

the employee may terminate the employment for any reason, except as provided by law. *Rackley*

*v. Fairview Care Ctrs., Inc.*, 23 P.3d 1022, 1026 (Utah 2001). An at-will employee may

overcome the at-will presumption by showing:

> (1) there is an implied or express agreement that the employment may be
> terminated only for cause or upon satisfaction of another agreed-upon condition;
> (2) a statute or regulation restricts the right of an employer to terminate an
> employee under certain conditions; or (3) the termination of employment
> constitutes a violation of a clear and substantial policy.

*Id.* (citations omitted).

While the Plaintiffs brought a number of additional causes of action against Wal-Mart in

their Complaint, the Plaintiffs' briefing on the Defendant's Motion for Summary Judgment

focuses on two claims for wrongful termination. First, the Plaintiffs allege that they had an

implied employment relationship, and that Wal-Mart could fire them only for cause. Second, the

Plaintiffs contend that they were wrongfully terminated in violation of public policy.

The court restricts its focus to these two causes of actions and, for the reasons stated in

the Defendant's Memorandum in Support of its Motion for Summary Judgment (Dkt. No. 65),

the court dismisses the remaining claims that the Plaintiffs did not argue.[3]

## III.   Breach of an Implied Employment Contract

The Plaintiffs argue that the presumption of at-will employment is overcome in this case

due to the existence of an implied-in-fact contract in which Wal-Mart agreed that the Plaintiffs

could only be terminated for cause. In Utah, it is the employee's burden to establish that the

---

[3]These causes of action include: (1) a claim for violation of the right to self-defense under
the Second Amendment of the United States Constitution and Article I, Section 6 of the Utah
Constitution; (2) Mr. Holt and Mr. Stewart's claims for unpaid suspension wages under the Fair
Labor Standards Act; and (3) Mr. Holt and Ms. Poulsen's claims for retaliation.

employer meant to be bound by an implied-in-fact contract: "[T]he employee must show that although there was no express contract provision to this effect, the parties nevertheless agreed that the employment would not be at will."  *Sorensen v. Kennecott-Utah Copper Corp.*, 873 P.2d 1141, 1145 (Utah Ct. App. 1994).  The employees must bring forth evidence of "a specific, affirmative, and definite manifestation of the employer's clear and unequivocal intention to relinquish the right to fire the at-will employee."  *Francisconi v. Union Pac. R.R. Co.*, 36 P.3d 999, 1002 (Utah Ct. App. 2001).  Moreover, "[i]n order for conduct and oral statements to establish an implied-in-fact contract, such evidence must be strong enough to overcome . . . any inconsistent written policies and disclaimers."  *Wood v. Utah Farm Bureau Ins. Co.*, 19 P.3d 392, 397 (Utah Ct. App. 2001) (citation omitted).  While the existence of such an agreement is typically a question of fact, "if the evidence presented is such that no reasonable jury could conclude that the parties agreed to limit the employer's right to terminate the employee, it is appropriate for a court to decide the issue as a matter of law."  *Sorensen*, 873 P.2d at 1145 (citation omitted).

The court finds that the Plaintiffs' cause of action for breach of an implied employment contract may be decided as a matter of law.  The Plaintiffs support their claim mainly with their own subjective beliefs about Wal-Mart's employment policies.  The Plaintiffs state in their affidavits that they believed they could not be terminated before they went through Wal-Mart's Coaching for Improvement Program, a belief that was bolstered by the extensive training regarding this program that some of the Plaintiffs received.  The Plaintiffs also testify that they were told orally that they would not be fired, provided they improved with coaching, except for cases of gross misconduct.  The Plaintiffs maintain that they never knew of any at-will

9

terminations during their time at Wal-Mart that did not first involve employee coaching.  Finally, the Plaintiffs cite language in the Wal-Mart Associate Handbook that they believe demonstrates Wal-Mart's intent to be bound by an implied-in-fact contract.

This evidence is insufficient for a reasonable jury to conclude that Wal-Mart had altered its at-will relationship with the Plaintiffs.  Utah courts have rejected the theory that a subjective belief is sufficient to create an issue of triable fact about an implied-in-fact contract.  These courts have emphasized that a plaintiff must bring forward evidence of specific acts performed by an employer that demonstrate the employer's intent to modify an at-will contract:

> [The plaintiff] relies solely on "her understanding" and "what she was taught."
> She does not point to affirmative and definite acts of [the employer]
> demonstrating [the employer]'s intent to modify its at-will contract with her.
> Thus, she has not raised a jury question as to whether [her employer] nullified its
> disclaimer and affirmatively offered her employment on terms different from the
> initial at-will contract.

*Kirberg v. West One Bank*, 872 P.2d 39, 42 (Utah Ct. App. 1994); *see also Wood*, 19 P.3d at 398 ("Although [the plaintiffs] may have subjectively believed [that they were not at-will employees], such belief was not reasonable without a more specific manifestation of [the employer]'s clear and unequivocal intention to relinquish the right to fire plaintiffs." (citation omitted)).

Here, the Plaintiffs are unable to point to any specific acts that show Wal-Mart's intent to alter the at-will contract.  While the Plaintiffs maintain that they were told that they would not be fired without first going through the coaching program, the Plaintiffs do not identify the specific content of any of these statements, the time when these statements were made, or the speaker who made these promises.  None of these statements indicates a "specific, affirmative, and definite manifestation of the employer's clear and unequivocal intention to relinquish the right to

fire the at-will employee." *Francisconi*, 36 P.3d at 1002.  Similarly, the fact that the Plaintiffs do not know of any fellow employees who were fired without first going through the coaching program does not establish Wal-Mart's clear intention to alter the at-will status of its employees.

Moreover, the Plaintiffs concede that Wal-Mart "never missed an opportunity" to provide the following caveat in any of its official documents: "This information does not create an express or implied contract of employment or any other contractual commitment." (Pls.' Mem. in Opp'n, at 3, Dkt. No. 91.)  In its policy language, Wal-Mart also included the warning that "[f]ailure to comply with this policy may result in disciplinary action, up to and including termination." (Wal-Mart Policy AP-09, Pls.' Mem. in Opp'n, Ex. 18, Dkt. No. 91.)  Wal-Mart never stated that this termination could only occur in cases of gross misconduct.  Instead, Wal-Mart emphasized that "[e]mployment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law." (Wal-Mart Job Offer Form, Defs.' Mem. in Supp., Ex. 21, Dkt. No. 65.)

Finally, the court is not persuaded by the Plaintiffs' argument that Wal-Mart created a binding commitment with its employees through language in its Associate Handbook.  This general language, which includes statements that employees should "stay and grow" with Wal-Mart and be part of the "Wal-Mart family," is too vague to create an implied-in-fact contract that alters the at-will relationship that Wal-Mart specifically set forth in other materials.

For these reasons, the court GRANTS Wal-Mart's Motion for Summary Judgment on the Plaintiffs' breach of an implied employment contract claim.

IV.     **Wrongful Termination in Violation of Public Policy**

In Utah, even an at-will employee may not be fired if her termination would violate

certain public policies.  But "[t]he public policy exception to the employment at-will

presumption is much narrower than traditional notions of public policy" and should be kept

narrow to "avoid unreasonably eliminating employer discretion in discharging employees."

*Rackley*, 23 P.3d at 1026-27.  Only "clear and substantial public policies will support a claim of

wrongful discharge in violation of public policy."  *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d

395, 404-05 (Utah 1998).  A public policy is "clear" only if it is "plainly defined by legislative

enactments, constitutional standards, or judicial decisions."  *Id.* at 405.  A public policy is

"substantial" if it is "of overreaching importance to the public, as opposed to the parties only."

*Id.* (citation omitted).

The Utah Supreme Court has outlined four categories of public policies eligible for

consideration under this exception: "(i) Refusing to commit an illegal or wrongful act, such as

refusing to violate the antitrust laws; (ii) performing a public obligation, such as accepting jury

duty; (iii) exercising a legal right or privilege, such as filing a workers' compensation claim; or

(iv) reporting to a public authority criminal activity of the employer."  *Hansen v. Am. Outline,*

*Inc.*, 96 P.3d 950, 952 (Utah 2004) (citation omitted).  The parties agree that only the third

category is at issue in this case, a category that "poses analytical challenges different from, and

generally greater than, the others."  *Id.*  The determination of whether a particular legal right or

privilege is protected by the public policy exception requires "a balancing of competing

legitimate interests: the interests of the employer to regulate the workplace environment to

promote productivity, security, and similar lawful business objectives, and the interests of the

employees to maximize access to their statutory and constitutional rights within the workplace."
*Id.* at 953.

The Plaintiffs allege that their terminations were in violation of their right to self-defense, which the Plaintiffs maintain is a substantial and weighty privilege protected by the Utah Constitution and a number of statutes.  The Defendants urge the court to reject this claim, since no Utah court has previously recognized a public policy exception to the at-will employment doctrine based on a right to self-defense.  The Honorable Ted Stewart noted the absence of any Utah cases discussing such an exception in *Davis v. Stock Building Supply West, Inc.*, 2005 WL 1828735 (D. Utah July 29, 2005).  In *Davis*, Judge Stewart held:

> The Utah courts have not previously recognized that [an action taken in self-defense] supports a claim of wrongful discharge in violation of public policy.  In the absence of clear direction from those courts, this court will not recognize such a public policy exception.  Further, such an exception would unreasonably eliminate an employer's ability to evenhandedly enforce strict workplace safety rules against any form of fighting or physical confrontation on the job site.

*Id.* at *1.  Wal-Mart argues that the court should apply similar reasoning to the claims that are now before it.

The court declines Wal-Mart's invitation because there are factual differences that distinguish the facts in this case from the *Davis* case.  Most importantly, the plaintiff in *Davis* was fired after she threw a piece of PVC pipe and injured a co-worker during an altercation.  *Id.* at *2.  The plaintiff claimed that her action was undertaken in self-defense after the co-worker rubbed his pelvis against her, an encounter that occurred after the plaintiff and the co-worker had a number of other allegedly harassing confrontations and interactions.  *Id.* at *4-5.  Judge Stewart found that the plaintiff had come forward with sufficient evidence to convince a reasonable jury

13

that she had suffered unlawful sexual harassment under Title VII.  Accordingly, Judge Stewart

denied the defendant's motion for summary judgment on the Title VII sexual harassment claim.

*Id.* at *5.  Because Judge Stewart allowed the plaintiff to proceed to trial on her cause of action

for harassment, his decision to deny her claim for wrongful termination in violation of her right

to self-defense did not preclude the plaintiff from the relief that she was seeking.  The plaintiff

was still able to argue for the full amount of damages that she would have been allowed under

her other theories.  The plaintiff's harassment claim was also more inclusive than her self-

defense claim in some ways, since it encompassed all of the interactions between the plaintiff

and her co-worker, and not simply the PVC incident.  There was no need for Judge Stewart to

conduct a thorough legal analysis of the self-defense question given the equally adequate, and

arguably more appropriate, theory of harassment under which the plaintiff could seek relief.

Here, the court is squarely faced with the self-defense question.  If the court were to

follow Judge Stewart's ruling in *Davis*, all of the Plaintiffs' remaining claims would necessarily

be dismissed.  While this result may be correct, the court is disinclined to bar the Plaintiffs from

any relief without conducting a searching inquiry to determine whether the right to self-defense

constitutes a clear and substantial public policy under Utah law that could serve as an exception

to the at-will employment doctrine.  The court does not interpret the Plaintiffs' argument as a

request to create a new exception to the presumption of at-will employment in Utah.  Instead, the

Plaintiffs have asked the court to decide whether the right to self-defense is the type of policy that

would fit into the narrow public policy exception that the Utah Supreme Court has already

created.  As a result, the test the court must apply is not whether there is a Utah case that has

recognized self-defense as the type of public policy that deserves protection in the employment

14

context.  Rather, the court must predict how Utah courts would rule if presented with this question.

The Plaintiffs cite a number of Utah constitutional provisions and state statutes in support of their argument that Utah courts would rule in their favor on this issue.  For instance, the Utah Constitution provides that "[a]ll men have the inherent and inalienable right to enjoy and defend their lives and liberty."  Utah Const. art. I, § 1.  A federal district court in California determined that similar language in the California Constitution was sufficient to find that the right to self-defense was "fundamental and well-established."  *Cocchi v. Circuit City Stores*, 2006 WL 870736, at *5 (N.D. Cal. Apr. 3, 2006).  Utah's "Stand Your Ground" law also emphasizes a fundamental right to self-defense: "A person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person or a third person from another person's imminent use of unlawful force."  Utah Code Ann. § 76-2-402(1)(a).  Based on these and other provisions, as well as Utah judicial opinions discussing the right to self-defense, the court finds that the Plaintiffs have made a colorable argument that Utah courts would recognize the right to self-defense as an example of a clear and substantial public policy that allows an exception to the at-will employment doctrine.  But the court is also cognizant of the observation made by Judge Stewart in *Davis*—namely, that a public policy exception based on self-defense could unreasonably restrict an employer's ability to enforce strict workplace safety rules about fighting or physical confrontation.  *See Davis*, 2005 WL 1828735, at *1.

Before making a ruling that balances the competing interests noted above, the court must answer the threshold question of whether a federal district court is the most appropriate entity to

first address this issue.  The court concludes that it is not, and instead certifies this question to the Utah Supreme Court.

A.   Certification to the Utah Supreme Court

Rule 41 of the Utah Rules of Appellate Procedure permits the Utah Supreme Court to answer questions of state law certified by a court of the United States "if the state of the law of Utah applicable to a proceeding before the certifying court is uncertain."  The court agrees with Wal-Mart that "[c]ertification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law." *Copier v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998) (quotation omitted).  But the court finds that certification is appropriate here for a number of reasons.

First, and for the reasons discussed above, the court disagrees with Wal-Mart that Utah has a well-established rule of applicable law concerning the right to self-defense in employment cases.  The Utah Supreme Court has conclusively established that there is a public policy exception to the at-will employment presumption. *See Hansen*, 96 P.3d at 952.  But it remains an open question whether the right to self-defense constitutes the type of clear and substantial public policy that is covered by this exception.  No court has yet undertaken the analysis of Utah's constitutional provisions, statutes, and judicial cases that would provide an answer to this question.  But the fact that no court has yet recognized the right to self-defense as an example of a public policy exception does not mean that this exception does not exist.  While the Utah Supreme Court stated that the public policy exception should be construed narrowly, it has never ruled that there is an exhaustive list of the policies that the exception covers.  To the contrary, the Utah Supreme Court's language in *Hanson* suggests a yet undefined number of rights or

16

privileges the State of Utah may deem significant enough to overcome the competing policy interests associated with at-will employment.

The mere uncertainty of Utah law on this issue does not require the federal court to certify a question to the Utah Supreme Court.  Federal courts are often faced with uncertainty in their application of state law, and they have the authority to decide these questions using the same tools that a state court would use to reach a decision.  But, in some cases, "[s]tate certification procedures are a very desirable means by which a federal court may ascertain an undecided point of state law."  *Lehman v. Schein*, 416 U.S. 386, 390-91 (1974) (Rehnquist, J., concurring).  Here, the interests of comity, federalism, and the efficient use of judicial resources are best supported by certification, especially since the issue presented is predominantly a matter of state policy. The answer to the question that the Plaintiffs raise may require a review of the Utah Constitution, legislative enactments, and judicial decisions.  The Utah Supreme Court is in the best position to determine how these materials, which include its own precedents, have treated the right to self-defense in Utah.  It is therefore appropriate to invite the Utah Supreme Court to determine the limits of the public policy exception that it outlined in *Hansen* and other cases.

In making its decision, the court has looked to the experience of other jurisdictions that have dealt with this question.  In West Virginia, a convenience store worker brought an action for wrongful termination in violation of public policy after he grabbed and subdued a robber during a hold-up, and was then fired for his actions.  *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 716 (W. Va. 2001).  The United States District Court for the Northern District of West Virginia certified to the West Virginia Supreme Court the question of whether the right to self-defense was a substantial public policy exception to at-will employment.  *Id.*  The West Virginia Supreme

Court answered that question in the affirmative: "[W]e find that the State of West Virginia recognizes a substantial public policy exception to the at will employment doctrine whereby an employee may defend him/herself against lethal imminent danger." *Id.* To balance the employee's interest in his right to self-defense with the employer's interest in its ability to enforce safety policies, the West Virginia Supreme Court further held that "an employer may rebut the presumption of a wrongful discharge based upon an employee's exercise of his/her right to self-defense by demonstrating that it based the termination upon a plausible and legitimate business reason." *Id.*

Federal district courts in the State of California have also addressed this issue, but these courts chose not to certify the question to the California Supreme Court. In *Cocchi v. Circuit City Stores*, 2006 WL 870736 (N.D. Cal. Apr. 3, 2006), the district court noted that California courts had not considered the self-defense question and that the public policy exception was "exceedingly narrow." *Id.* at *6. Nevertheless, the district court found that California law supported a public policy exception based on self-defense:

> The Court concludes that under article 1, § 1 of the California Constitution [stating that the right to defend life and liberty is inalienable], an employee, at a minimum, has a fundamental right to defend himself from physical injury where it is not possible to avoid the altercation, either by retreating or summoning help. Any other reading of the California Constitution would amount to holding that employers may deprive their employees of their right to self-defense altogether. Such a holding cannot be squared with the fact that the right to self-defense is enshrined in the California Constitution as a fundamental right.

*Id.*

But a later order that was issued by a different judge on the United States District Court for the Northern District of California disagreed with this decision. *See Johnson v. CVS*

*Pharmacy, Inc.*, 2011 WL 4802952, at *5 (N.D. Cal. Oct. 11, 2011).  In *Johnson*, the district

court noted that the California Supreme Court had recently narrowed the general theory of public

policy torts in a case involving an employee's right to use marijuana.  *Id.*  With this consideration

in mind, the district court held:

> Until the appellate state courts in California authoritatively establish a self-
> defense public policy tort or our own court of appeals does so, the undersigned
> judge is most reluctant to recognize such a tort, at least on the facts here.  While
> self-defense is important, it is not unique to the workplace, and it would be all too
> easy to engage in workplace violence and then invoke self-defense, including
> phony invocations of self-defense.  Were a public policy tort recognized, then
> employers would be deterred from firing violent employees for fear of being sued
> for infringing a public policy.

*Id.*  Given these competing federal district court decisions, it remains unclear in California

whether employees may pursue a cause of action for wrongful termination in violation of

California State public policy that is based on a right to self-defense.

To avoid this confusion, the court prefers to adopt the West Virginia approach.  By

certifying a question, the court gives the Utah Supreme Court the opportunity to issue a ruling

that will provide clarity and consistency to this area of state law for both employers and

employees.

Finally, the court notes that the Utah Supreme Court has the discretion to reject the

question that the court certifies.  Rule 41(e) of the Utah Rules of Appellate Procedure provides:

"Upon the filing of the certification order and accompanying papers with the clerk, the Supreme

Court shall promptly enter an order either accepting or rejecting the question certified."  Given

this discretion, the court sees no harm in allowing the Utah Supreme Court to decide for itself

whether it should address this issue.  If the Utah Supreme Court rejects the question, this court

stands ready to perform the required analysis.

      B.    <u>Facts Assumed to Be True for Certification</u>

      Wal-Mart argues that the court's above analysis is unnecessary because, in any event, Wal-Mart incorporates the right to self-defense in its own policies.  The policy under which five of the Plaintiffs were terminated, Policy AP-09, states: "Associates may only defend themselves or others to the extent necessary to disengage the Suspect and withdraw from the situation."  It is Wal-Mart's position that the Plaintiffs' actions went beyond the defensive maneuvers that would have been required to withdraw safely from the three situations described above.  Wal-Mart's argument asks the court to make inferences that are impermissible at the summary judgment stage, since the court must view the facts in the light that is most favorable to the non-moving party.  Here, the factual question of whether the Plaintiffs acted only in self-defense is precisely the disputed issue that the Plaintiffs would like to put in front of a jury.  The Plaintiffs contend that Wal-Mart did not follow its own policies because it incorrectly decided that the Plaintiffs' actions went beyond those required for self-defense.  But before a jury may resolve these disputed factual issues, the court must first ascertain that there is a legal basis on which the Plaintiffs may proceed.

      Accordingly, the court assumes for purposes of certifying the self-defense question to the Utah Supreme Court that Mr. Ray, Ms. Poulsen, and Mr. Stewart were unable to safely disengage from Mr. Longton after he pulled out his gun in the closed office.  Similarly, the court assumes that Mr. Holt and Mr. Hunter were acting according to Wal-Mart's procedures when they initially grabbed Ms. Harrison and that they were unable to let go of her after they became aware that she had a knife without a legitimate and reasonable fear that they would be stabbed.  The Plaintiffs

may fail to convince a jury of these facts, and therefore Wal-Mart may win its case even if the Plaintiffs are allowed to proceed on their self-defense theory.  But the court finds that these Plaintiffs have presented sufficient evidence that a reasonable jury could find that their version of events is credible, and it is therefore premature to decide these factual issues at this time.

It is not premature, however, to address Mr. Dallin's claims.  The facts in Mr. Dallin's case are analytically distinct from the circumstances involving the other five Plaintiffs.  Even viewing the evidence in the light most favorable to him, Mr. Dallin has not come forward with facts that would allow a reasonable jury to grant him relief.  Unlike the other Plaintiffs, Mr. Dallin was not fired for violating Policy AP-09, which instructs employees to withdraw from dangerous situations, but for violating Policy PD-48, which prohibits acts of workplace violence. In his encounter with Mr. Rigotti, Mr. Dallin did not attempt to remove a gun or other weapon that Mr. Rigotti was threatening to use.  Instead, he affirmatively went looking for Mr. Rigotti and then shoved him into an area of store shelving.  Mr. Dallin claims that he performed this action in an attempt to protect Ms. Rigotti.  But it is undisputed that several minutes elapsed between the time that Mr. Rigotti first encountered Mr. Dallin and Ms. Rigotti and the later incident with the store shelving.  During this time, Mr. Dallin could have sought the assistance of other employees or emergency aid if he was genuinely concerned that Mr. Rigotti posed a substantial threat to Ms. Rigotti.  A reasonable jury could not find that Mr. Dallin acted in self-defense or in response to an immediate threat to Ms. Rigotti.  As a result, the court GRANTS summary judgment to Wal-Mart on Mr. Dallin's claims.

QUESTION TO BE CERTIFIED

The court has carefully considered the proposed certification questions that the parties

have submitted.  But the court declines to adopt either party's suggestion because it finds that the best approach is to adopt the question that was certified to the West Virginia Supreme Court in *Feliciano*.  Accordingly, the court certifies the following question to the Utah Supreme Court: "Is the right of self-defense a substantial public policy exception to the at-will employment doctrine, which provides the basis for a wrongful discharge action?"

CONCLUSION

For the reasons stated above, Wal-Mart's Motion for Summary Judgment (Dkt. No. 64) is GRANTED IN PART and DENIED IN PART.  The court dismisses all of the Plaintiffs' causes of action other than their claim for wrongful termination in violation of public policy.  The court also dismisses all of Mr. Dallin's claims against Wal-Mart.  As a result, Mr. Dallin's Motion for Sanctions against Wal-Mart (Dkt. No. 67) is DENIED AS MOOT.

Wal-Mart has filed a Motion for Sanctions against Mr. Holt and Mr. Ray for spoliation of certain evidence.  Given the court's disposition of Wal-Mart's Motion for Summary Judgment, some of these issues may now be moot.  But Wal-Mart may still wish to argue that Mr. Holt's training binder and Mr. Ray's Facebook account contained evidence that is relevant to the disposition of the Plaintiffs' wrongful termination claims.  Accordingly, Wal-Mart's Motion for Sanctions (Dkt. No. 60) is DENIED WITHOUT PREJUDICE to refile once the court has received an answer on the certified question from the Utah Supreme Court.  The court vacates the hearing on this motion that is currently set for November 1, 2013, and DENIES AS MOOT the Plaintiffs' Motion to Continue this hearing.  (Dkt. No. 116.)

The court will certify its proposed question to the Utah Supreme Court by separate order. The court ORDERS that all proceedings in this case are STAYED until resolution of the certified

question.

SO ORDERED this 8th day of October, 2013.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge