MANNING CURTIS BRADSHAW
   & BEDNAR PLLC
Kathleen W. Toth, #8437
James E. Ji, #12352
136 E. South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
ktoth@mc2b.com
jji@mc2b.com

*Attorneys for Defendant Walmart Stores, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| SHAWN H. RAY, an individual; GABRIEL M. STEWART, an individual; LORI POULSEN, an individual; JAMES DALLIN, an individual; DEREK HOLT, an individual; and ERIC HUNTER, an individual;<br><br>               Plaintiffs,<br><br>       - vs -<br><br>WALMART STORES, INC., a Utah Corporation,[1]<br><br>          Defendant. | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No.  1:11-cv-00104-RJS<br><br>Judge Robert J. Shelby |

---

[1]  The caption to Plaintiffs' Complaint incorrectly states that Walmart Stores, Inc. is a Utah corporation. Walmart Stores, Inc. is a Delaware corporation.

## TABLE OF CONTENTS

RELIEF SOUGHT AND GROUNDS FOR MOTION……………..…………….…..………    iii

RELEVANT PROCEDURAL HISTORY…………………………………………………    v

STATEMENT OF UNDISPUTED FACTS…...……………………………………………..    vii

    A.    West Valley Plaintiffs…………………………………………………...    vii

    B.    Layton Plaintiffs…………………………………………………...    x

ARGUMENT…………………………………………………………………………    1

    I.    GOVERNING LEGAL STANDARD………………………………….    1

    II.    HOLT AND HUNTER'S CLAIMS SHOULD BE DISMISSED BECAUSE THE UNDISPUTED EVIDENCE SHOWS THAT NO REASONABLE JURY COULD FIND THEY HAD "NO OPPORTUNITY TO WITHDRAW."…………………………………………………………    1

    III.    POULSEN'S CLAIM SHOULD BE DISMISSED UNDER THE AFTER-ACQUIRED EVIDENCE DOCTRINE; IN THE ALTERNATIVE, THIS DOCTRINE CAPS THE AMOUNT OF HER ALLEGED DAMAGES FOR WRONGFUL TERMINATION……………........................................................    4

CONCLUSION…………………………………………………………………….……    7

## RELIEF SOUGHT AND GROUNDS FOR MOTION

Defendant Wal-Mart Stores, Inc. ("Defendant" or "Walmart"), by and through its counsel, moves pursuant to Fed. R. Civ. P. 56 for the entry of a summary judgment dismissing with prejudice the wrongful termination claims asserted by Plaintiffs Holt, Hunter, and Poulsen.

Holt and Hunter's claims fail as a matter of law because the undisputed evidence shows that no reasonable jury could conclude they had "no opportunity to withdraw" during their apprehension of a shoplifter who pulled out a pocketknife and became hostile.  The Utah Supreme Court answered the question of whether Utah recognizes a self-defense public policy exception to the at-will doctrine in the affirmative.  *Ray et al. v. Walmart Stores, Inc.*, 2015 UT 83.  However, the Utah Supreme Court explained that the exception only applies under "narrow circumstances" (*id.* at ¶ 11), which the Court defined as follows:  **"[W]e limit the exception to situations where an employee reasonably believes that force is necessary to defend against an imminent threat of serious bodily harm *and* the employee has <u>no</u> opportunity to withdraw."**  *Id.* at ¶ 2 (emphasis added).  As demonstrated below, undisputed evidence clearly shows that Holt and Hunter had an opportunity to withdraw at multiple points during their confrontation with shoplifter Maryanne Harrison.

Poulsen's claim is subject to the after-acquired evidence doctrine.  The doctrine applies where, during the course of discovery, the employer discovers information which would have resulted in the employee's termination.  The after-acquired evidence doctrine either: (a) completely bars a plaintiff's wrongful termination claim; or (b) caps the plaintiff's alleged damages to the period between plaintiff's termination and the time the employer learns of the

alternative ground for termination.

Here, Poulsen admitted in her deposition that the stop and investigation of shoplifter Trent Longton violated Walmart Policy AP-09 because all four elements required by the policy were not established.  Specifically, Policy AP-09 requires that, before stopping or investigating a suspect, four elements must be established: (1) selection; (2) concealment / dispossession; (3) continued possession of the merchandise; and (4) passing the last point of sale.  The policy states: **"If a suspect enters a restroom or fitting room with selected merchandise, visual contact has been lost and all four elements must be re-established."**  Based on the deposition testimony of Poulsen and Ray, it is undisputed that Mr. Longton went into the restroom and that all four elements were not reestablished when they stopped and detained him.  Poulsen, who was the supervisor over the Layton Walmart's Asset Protection associates, repeatedly admitted that it was a "bad" stop because they "had lost the four elements."  Supervisor Poulsen did nothing to terminate the bad stop.  Poulsen also admitted that she did not inform her supervisors that the stop was bad; and Poulsen even told her subordinate to omit this critical information from the Walmart case report since it would provide grounds for termination.[2]

This evidence came to Walmart's attention after it had already terminated Poulsen for the reasons at issue in this case.  Poulsen would have been terminated by Walmart had it known that

---

[2]  Unlike Poulsen, Ray testified that he did not know Mr. Longton had entered the restroom until after the incident was over.  Thus, based on the current testimonial record, Walmart does not contend that Ray's claim is subject to the after-acquired evidence doctrine.  Walmart reserves the right to assert the doctrine against Ray in the event he changes his testimony or other evidence comes to light.  As for Plaintiff Stewart, Walmart acknowledges that Stewart would not be terminated for this reason since he was an Assistant Store Manager who was providing assistance as a witness to the investigation. Unlike Poulsen and Ray, Stewart was not an AP associate and was not responsible for the stop taking place.

they stopped and investigated Longton without reestablishing all four elements.  Thus, Poulsen's claims should be dismissed under the after-acquired evidence doctrine; in the alternative, at a minimum, her alleged damages for wrongful termination should be capped by the application of the after-acquired evidence doctrine.

## **RELEVANT PROCEDURAL HISTORY**

The Plaintiffs in this case are Shawn Ray ("Ray"), Gabriel Stewart ("Stewart"), and Lori Poulsen ("Poulsen") (collectively, the "Layton Plaintiffs"); and Derek Holt ("Holt") and Eric Hunter ("Hunter") (collectively, the "West Valley Plaintiffs").[3]

On May 27, 2011, Plaintiffs filed this lawsuit against Walmart in the Second Judicial District of Utah, Davis County (Farmington Department).  *See* Dkt. #2-2, Complaint ("Compl.").  In their Complaint, Plaintiffs primarily asserted the following claims: (1) wrongful termination (breach of employment agreement); (2) wrongful termination (violation of public policy); and (3) violation of the right to self-defense under the Second Amendment to the U.S. Const. and Article I, Section 6 of the Utah Const.  *Id.* at ¶¶ 68-83, 90-98.  Additionally, Holt and Stewart alleged claims for unpaid suspension wages, and Holt and Poulsen alleged individual claims for retaliation.  *Id.* at ¶¶ 84-89, 99-124.

---

[3]  The sixth named Plaintiff, James Dallin ("Dallin"), was employed as an Assistant Store Manager at Walmart store #4689, located in Cedar Hills, Utah.  Dallin was terminated for violating Walmart Policy PD-48 ("Workplace Violence Policy").  Specifically, Dallin violated Walmart's Workplace Violence Policy when he shoved a customer into store shelving.  Dallin claims that he did so to protect himself and the customer's wife, who was an associate working at the Cedar Hills store that night.  The customer came to the store because he believed that Dallin was having an affair with his wife.  Plaintiff Dallin was dismissed as a plaintiff in this lawsuit when the Court entered a summary judgment against him on October 9, 2013.  *See* Dkt. #117.  The Court concluded that "[a] reasonable jury could not find that Mr. Dallin acted in self-defense or in response to an immediate threat to Mr. Rigotti."  *Id.* at 21.

On September 14, 2012, Walmart filed a Motion for Summary Judgment seeking the dismissal of all of Plaintiffs' claims. Dkt. #64. Among other reasons, Walmart argued that, under Utah law, Plaintiffs' claim of "self-defense" is not recognized as a public policy exception to the at-will doctrine.

On October 9, 2013, the Court entered an Order granting in part and denying in part Walmart's Motion for Summary Judgment. Dkt. #117. The Court dismissed all of Plaintiff Dallin's claims. *Id.* As for the remaining Plaintiffs, the Court dismissed all claims except for their wrongful termination in violation of public policy claim. *Id.* The Court decided to certify to the Utah Supreme Court the question of whether Utah law allows the Plaintiffs to pursue an action for wrongful termination in violation of their right to self-defense. *Id.*

On October 11, 2013, the following question of law was certified to the Utah Supreme Court: "Is the right of self-defense a substantial public policy exception to the at-will employment doctrine, which provides the basis for a wrongful discharge claim?" Dkt. #118.

On September 17, 2015, the Utah Supreme Court answered the certified question in the affirmative. *Ray et al. v. Wal-Mart Stores, Inc.*, 2015 UT 83. However, the Utah Supreme Court held: **"[W]e limit the exception to situations where an employee reasonably believes that force is necessary to defend against an imminent threat of serious bodily harm and the employee has no opportunity to withdraw."** *Id.* at ¶ 2 (emphasis added).

On November 3, 2015, this Court held a status conference to discuss the resumption of this case in light of the Utah Supreme Court's decision. At the hearing, the Court agreed that Walmart should have an opportunity to move for summary judgment given that the Utah

Supreme Court announced a new public policy exception to the at-will doctrine.  The Court

stated that Walmart should have an opportunity to make summary judgment arguments that were

not made in its initial Motion for Summary Judgment due to the fact that a self-defense public

policy exception was not previously recognized in Utah.

## STATEMENT OF UNDISPUTED FACTS

**A.**    **West Valley Plaintiffs.**

1.    Walmart Store #3568 is located in West Valley City, Utah ("West Valley

Walmart").

2.    Holt was employed by the West Valley Walmart from 2005 to 2011.[4]  Ex. A,

Excerpts of Deposition of Derek Holt ("Holt Dep.") 159:7-9, 162:2-8.  Holt worked as an Asset

Protection Coordinator ("APC"), which is a manager position that oversees the store's Asset

Protection Associates ("APAs").  *Id.* at 16:22-17:17.  Prior to becoming the West Valley

Walmart's APC, Holt worked there as an APA.  *Id.*

3.    Hunter was employed by Walmart from 1999 to 2011.  Ex. B, Excerpts of

Deposition of Eric Hunter ("Hunter Dep.") 153:22-156:5. In 2008, Hunter started working at the

West Valley Walmart as an APA.  *Id.*  Hunter's direct supervisor was Holt.  *Id.* at 10:1-3.

4.    Among other job functions, Walmart employees (or "associates") in Asset

Protection ("AP") perform the job of investigating, documenting and, in certain limited

---

[4]  For a brief period during that time, Holt transferred to the Walmart store in Riverton, Utah.  Ex. A, Holt Dep. 161:4-12.

situations, preventing theft of merchandise by customers and employees.  Ex. C, Excerpts of Deposition of Shawn Ray ("Ray Dep.") 47:25-48:12.

5.      On December 24, 2010, Holt and Hunter were involved in the stop and apprehension of a customer named Maryanne Harrison ("Harrison"), who was attempting to shoplift various items totaling about $38.15 in value.  Ex. D, Walmart AP Case Record (12/24/2010 West Valley City store incident) (designated as Confidential; filed under seal).

6.      That apprehension of Harrison was captured on the West Valley Walmart's surveillance cameras.  *See* Ex. E, West Valley Surveillance Video #1 (vestibule area looking towards the customer parking lot) at 15:35-16:35 (designated as Confidential; filed under seal); Ex. F, West Valley Surveillance Video #2 (vestibule area looking towards the store) at 15:35-16:35 (designated as Confidential; filed under seal).

7.      In the surveillance videos, Harrison is the woman wearing the dark baggy pants and jacket, dark hat, and dark nap sack.  Ex. A, Holt Dep. 36:23-37:4; Ex. B, Hunter Dep. 29:15-22.  Holt is the man with the shaved head and goatee, blue jeans, and dark coat with grey hood. Ex. A, Holt Dep. 39:4-14; Ex. B, Hunter Dep. 33:7-11.  Hunter is the man with the dark hoodie, blue jeans, and baseball cap with sun glasses.  Ex. A, Holt Dep. 37:12-18; Ex. B, Hunter Dep. 29:23-30:7.

8.      In addition, there were also three other APAs (all nonparties) involved in the Harrison apprehension who can be seen in the surveillance videos: Bentley Lovelady (man with the black and red winter coat); Heather Larson (woman with the light tank top and light grey

jacket); and Colette Deleev (woman with the dark long sleeve sweater and short hair). Ex. A, Holt Dep. 37:19-38:5; Ex. B, Hunter Dep. 33:16-23, 38:20-39:8.

9.      Holt and Hunter, along with the three other APAs, confronted Harrison as she was about to exit the store through the automatic sliding doors in the vestibule. Exs. E, F.

10.      When Harrison tried to run away, Hunter grabbed onto one of Harrison's arms, and Holt then grabbed onto her other arm. *Id.* Harrison began swinging her arms wildly to pull away from them. *Id.*

11.      During the struggle, Harrison pulled out a pocketknife and yelled for them to let her go or she would stab them. Ex. D.

12.      Holt and Hunter did not disengage Harrison, despite the fact that they both knew she had a weapon and was hostile. Exs. D, E, F.

13.      Eventually, with the assistance of a nearby customer, they were able to pry the pocketknife from Harrison's hand and force her into the store's AP office. *Id.*

14.      In the AP office, Holt and Hunter continued to forcibly restrain Harrison against the wall, despite the fact that they both knew she had pulled out a pocketknife and was hostile. Ex. G, West Valley Surveillance Video #3 (camera looking into the AP office) 15:35-46:40 (designated as Confidential; filed under seal).

15.      In response to a 911 call made by one of the other APAs, police officers from the West Valley City Police Department arrived within several minutes and arrested Harrison. Exs. D, G.

16.     It was about seven minutes from the time that Ms. Harrison was forced into the AP office and the arrival of the police.  Ex. G.

17.     During that time, Holt and Hunter did not know whether Harrison had any other weapons.  Ex. A, Holt Dep. 43:17-24 ("Q. … Did you ever check Ms. Harrison for other weapons other than the knife?  A. No."); Ex. B, Hunter Dep. 100:1-3 ("Q. Did you guys at any time check Ms. Harrison for other weapons?  A. I didn't.  I don't know if they did.").

18.     Walmart conducted an internal investigation into the December 24th incident involving Harrison.  As a result of that investigation, on January 24, 2011, Holt was terminated for violating Walmart Policy AP-09.  Ex. H, Holt Exit Interview (designated as Confidential; filed under seal).  Plaintiff Hunter was also terminated for violating Policy AP-09.  Ex. I, Hunter Exit Interview (designated as Confidential; filed under seal).

19.     Policy AP-09, which concerns the investigation and detention of shoplifters by Walmart associates, states (among other things):

> If the Suspect is believed to possess a weapon, the Suspect must not be approached.  If during an approach or investigation, it becomes apparent that the Suspect has a weapon or brandishes or threatens use of a weapon; all associates must disengage from the situation, withdraw to a safe position, and contact law enforcement.
>
> If at any point the Suspect or any other involved becomes violent, disengage from the confrontation, withdraw to a safe position and contact law enforcement.

Ex. J, Policy AP-09 at 3 (designated as Confidential; filed under seal).

**B.      Layton Plaintiffs.**

20.     Walmart Store #1699 is located in Layton, Utah ("Layton Walmart").

21.     Poulsen was employed by Walmart from 2003 to 2011.  Ex. K, Excerpts of Deposition of Lori Poulsen ("Poulsen Dep.") 19:3-8.  Poulsen worked as a salaried APC at the Layton Walmart from February 2008 until her termination in January 2011.  *Id.* at 19:15-20:7. As the Layton Walmart's APC, Poulsen directly supervised all of the store's APAs, including Ray.  *Id.* at 20:8-10, 24:8-14.

22.     Ray was employed by the Layton Walmart from 2008 to 2011.  Ex. C, Ray Dep. 44:16-21.  Ray worked as an hourly APA from 2010 until his termination in January 2011.  *Id.* at 44:22-8.  Ray's direct supervisor was Poulsen.  *Id.* at 47:9-13.

23.     Stewart was employed by Walmart from 1998 to 2011.  Ex. L, Excerpts of Deposition of Gabriel Stewart ("Stewart Dep.") 22:23-23:2. Stewart worked as a salaried Assistant Store Manager ("ASM") at the Layton Walmart from early 2009 until his termination in January 2011.  *Id.* at 23:5-25.

24.     On January 13, 2011, Poulsen, Ray and Stewart were involved in the stop and apprehension of a customer named Trent Longton ("Longton"), who was attempting to steal a laptop computer by concealing it in his pants.  Ex. M, Walmart AP Case Record (1/13/2011 Layton store incident) (designated as Confidential; filed under seal).

25.     When Longton attempted to exit the store, he was confronted by multiple AP associates.  *Id.*  A group of five AP associates (including Plaintiffs Ray and Poulsen) escorted Longton into the AP office at the front of the store.  *Id.*

26.     Plaintiff Stewart, an Assistant Store Manager, joined them in the AP office.  *Id.*

27.     Once inside the AP office, Longton took the laptop out of his pants and put it on the office desk.  *Id.*  Longton stated something to the effect of, "You have your laptop, I am now going to leave, and I have something I am not supposed to have."  *Id.*

28.     Longton moved towards the office door, but multiple associates (including Ray) blocked his attempt to leave.  A struggle ensued between Longton and four of the associates (including Plaintiffs Ray, Stewart, and Poulsen), during which time they observed Longton move a gun from his back area to his coat pocket.  *Id.*

29.     The four associates did not disengage Longton and continued wrestling with him, despite the fact that they knew he possessed a weapon and was hostile.  *Id.*  Eventually, they were able to pry the gun away from Longton and pinned him against the wall.  *Id.*

30.     In response to a 911 call made by one of the other APAs, police officers from the Layton City Police Department arrived within minutes and arrested Longton.  *Id.*

31.     Walmart conducted an internal investigation into the January 13th incident involving Longton.  As a result of that investigation, in January 2011, Poulsen, Ray and Stewart were terminated for violating Policy AP-09.  Ex. N, Ray Exit Interview (designated as Confidential; filed under seal); Ex. O, Poulsen Exit Interview (designated as Confidential; filed under seal); Ex. P, Stewart Exit Interview (designated as Confidential; filed under seal).  Specifically, they were terminated because they failed to disengage and safely withdraw from Mr. Longton despite the fact that they knew he possessed a weapon and was hostile.

32.     As explained below, and as Poulsen admitted in her deposition, the apprehension of Mr. Longton violated Policy AP-09 because the Layton AP associates had not established all four of the elements required to stop and/or investigate a suspect. *See infra* ¶¶ 33-44.

33.     Policy AP-09 states:

An "unlawful Taking" has occurred when one or more Authorized Associates have observed a Suspect taking the merchandise of a Facility by committing each of the four acts set forth below ("Four Elements"):

• Selection. The Suspect must select and take possession of the Facility's merchandise.

• Concealment/Dispossession. The Suspect must either conceal or reasonably demonstrate the intent to steal the merchandise in their possession.

▪ Concealment: A Suspect places a box of computer software into a backpack.

▪ Dispossession: A Suspect removes the tag from a leather coat.

• Continued Possession of the Merchandise. After observing concealment and/or dispossession, the Authorized Associate must maintain visual contact with the Suspect in a manner sufficient to conclude the Suspect still has possession of the merchandise until they pass the last point of sale.

• Passing the Last Point of Sale. The Suspect must pass the last point of sale, fail to pay for the merchandise, and enter the vestibule or final point of exit. If there is a sidewalk sale with a register outside the vestibule, then the Suspect must move beyond the register and sidewalk before being approached.

Authorized Associates may surveil a Suspect alone or work with other Authorized Associates to conduct surveillance first hand. Walmart video surveillance equipment may only be used to obtain the Four Elements required by this policy when working with another Authorized Associate.

**If a suspect enters a restroom or fitting room with selected merchandise, visual contact has been lost and all four elements**

> **must be re-established.  Video surveillance is NEVER permitted within a restroom or a fitting room.**
> …
> **Approaching and Investigating Suspects**
>
> **An Authorized Associate may approach a Suspect to investigate an Unlawful Taking only if an Authorized Associate has observed all four elements in accordance with this policy….**

Ex. J, Policy AP-09 at 2 (emphasis added).

34.     Poulsen admitted that prior to escorting Mr. Longton into the AP office, she learned that Longton had gone into the Layton Walmart's restroom with the laptop computer. Ex. K, Poulsen Dep. 60:18-24 ("Q. At what point did you become aware of it?  A. As we were entering the room, somebody had said he had been in the restroom.  Q. Okay.  So as the AP associates and you are filing into the AP office with Mr. Longton, somebody says, "He has been in the restroom"?  A. Yes."), 61:8-10 ("Q. So you learned that information literally as you were coming into the room?  A. Yes.").

35.     Thus, under Policy AP-09, "visual contact [was] lost and all four elements [were required to] be re-established" before the Layton Walmart's AP associates could stop and/or investigate Mr. Longton. *Supra* ¶ 33.

36.     Poulsen admitted that the apprehension of Mr. Longton violated Policy AP-09 because all four elements were not reestablished after he went into the restroom.  Ex. K, Poulsen Dep. 64:16-22 ("Q. But at the point that he had put the laptop on the table, you were aware that he'd gone into the bathroom; correct?  A. Yes.  **Q. And that you had lost the four elements;**

**correct?  A. Yes.**") (emphasis added), 67:6-9 ("Q. So you were planning on, when you got back to work, notifying [your supervisors at Walmart] that it had been a bad stop?  A. Yes.").

37.    Poulsen admitted that, even though she was APC and supervisor over the APAs, she did not direct them to terminate the stop of Mr. Longton even though she knew that all four elements were not present.  *Id.* at 63:17-22 ("Q. So at the time that you learned, as you're filing into the AP office, that there's been – that the suspect had gone into the bathroom, did you turn to Kelly Gentle or anyone and say, 'We need to stop with this apprehension, because we've lost the four elements'?  A. No.").

38.    Poulsen admitted that, in her opinion, the bad stop of Mr. Longton warranted the termination of the AP associate (Kelly Gentle) who had initial responsibility for the stop.  Ex. K, Poulsen Dep. 65:18-19 ("A. So I thought it would cost her her AP position."); *see also id.* at 62:6-9 ("Q. And did you think spelling it out, if he'd gone into the bathroom before the stop, would get Ms. Gentle in trouble?  A. Yes.").

39.    Poulsen admitted that she suggested to Ms. Gentle to intentionally omit from her report to Walmart that Mr. Longton had gone into the restroom and that the stop was therefore made without all four elements being met.  *Id.* at 61:11-16 ("Q. Did you ever tell anyone not to mention that Trent Longton had gone into the bathroom before his apprehension?  A. Not before his apprehension.  Afterwards, I did tell Kelly that spelling it out would get herself in trouble.").

40.    Ms. Gentle's case report for the Longton stop does not, in fact, mention that Mr. Longton had gone into the restroom and that he was stopped and investigated without the four elements being reestablished.  Ex. M.

41.    Poulsen admitted that she failed to inform any of her supervisors at Walmart that the stop of Mr. Longton was bad because he had gone into the restroom and all four elements were not reestablished prior to stopping and investigating him.  Ex. K, Poulsen Dep. at 66:7-22 ("Q. Did you inform anyone with Walmart's supervision that this had been a bad stop?  A. No.").

42.    Ray admitted that he knew that Policy AP-09 requires that all four elements must be reestablished if the suspect goes into the restroom.  Ex. C, Ray Dep. 96:6-10, 96:17-18 ("Q. So if they go into a restroom – A.  You have to start over.").

43.    It was not until the Layton Plaintiffs' depositions that Walmart learned that Mr. Longton had gone into the restroom and that he was stopped and investigated without the four elements being reestablished.  Ex. Q, Declaration of Chad Reynolds ("Reynolds Decl.") ¶¶ 4-6.

44.    Had Poulsen not already been terminated, she would have been terminated for violating Policy AP-09 because she stopped and investigated Longton knowing that all four elements had not been reestablished after he went into the restroom.  *Id.*

## ARGUMENT

## I.     GOVERNING LEGAL STANDARD.

Pursuant to Rule 56(a), "[s]ummary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).  "The nonmovant cannot rest upon his or her pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Id.*  "A judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for [nonmovant] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "The mere existence of a scintilla of evidence in support of [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for [nonmovant]." *Id.*

## II.     HOLT AND HUNTER'S CLAIMS SHOULD BE DISMISSED BECAUSE UNDISPUTED EVIDENCE SHOWS THAT NO REASONABLE JURY COULD FIND THEY HAD "NO OPPORTUNITY TO WITHDRAW."

As stated, the Utah Supreme Court answered the question of whether Utah recognizes a self-defense public policy exception to the at-will doctrine in the affirmative.  *Ray*, 2015 UT 83.  However, the Utah Supreme Court explained that the exception is only applicable under "narrow circumstances" (*id.* at ¶ 11), which the Court defined as follows:  **"[W]e limit the exception to situations where an employee reasonably believes that force is necessary to defend against**

**an imminent threat of serious bodily harm <u>and</u> the employee has no opportunity to withdraw."**  *Id.* at ¶ 2 (emphasis added).  Thus, to prevail under the self-defense public policy exception, Plaintiffs must prove that all of the following elements are satisfied:

1. There is an imminent threat of serious bodily harm;
2. The employee reasonably believes force is needed to defend against the harm; and
3. The employee has no opportunity to withdraw.

Walmart can demonstrate at trial that Holt and Hunter's claims fail because they cannot satisfy elements 1 and 2.  However, a trial on their claims is unnecessary and futile because undisputed evidence shows that no reasonable jury could find that Holt and Hunter had "<u>no</u> opportunity to withdraw" (emphasis added) when Ms. Harrison became hostile and pulled out a pocketknife.  Under the Utah Supreme Court's standard, if there is any opportunity to withdraw, the self-defense public policy exception does not apply.

This Court conducted a similar type of analysis in dismissing Plaintiff Dallin's claims as a matter of law.  *See* Oct. 9, 2013 Mem. Decision & Order 21.  Dallin alleged that he was acting in self-defense and in defense of a coworker (Mrs. Kjera Rigotti) when he physically shoved Mr. Francisco Rigotti into some store shelving and escorted him out of the Cedar Hills Walmart.  *Id.* at 6-7.  The Court concluded that "[e]ven viewing the evidence in the light most favorable to him, Mr. Dallin has not come forward with facts that would allow a reasonable jury to grant him relief."  *Id.* at 21.  Of central importance to the Court's conclusion was the undisputed fact that "several minutes elapsed" between the time that Dallin first encountered Mr. Rigotti and the later incident involving the store shelving, which Dallin claims was an act of self-defense.  *Id.*  The Court reasoned that, during those several minutes, Dallin could have sought help and/or used

non-physical means to respond to the threat posed by Mr. Rigotti.  *Id.* The Court concluded: "A reasonable jury could not find that Mr. Dallin acted in self-defense or in response to an immediate threat to Ms. Rigotti."  *Id.*

Holt and Hunter's claims should be dismissed as a matter of law under a similar analysis of undisputed facts.  The first and foremost piece of undisputed evidence is the surveillance videos capturing the apprehension of Ms. Harrison.  During their encounter with Ms. Harrison, Holt and Hunter discovered that Harrison had a pocketknife.  Statement of Undisputed Facts ("SOF") ¶¶ 9-14.  Harrison verbally threatened them with this pocketknife.  *Id.*  Harrison also became hostile.  *Id.*  At that point, rather than disengaging Harrison and withdrawing, Holt and Hunter continued to physically struggle with Harrison; subdued her and forced her into the AP office; and then restrained her against the wall in the AP office.  *Id.*

This undisputed evidence shows that Holt and Hunter had an "opportunity to withdraw" at multiple different points during the confrontation with Harrison – yet they failed to do so. First, Holt and Hunter could have immediately disengaged Harrison and withdrawn when they discovered she had a pocketknife.  The confrontation with Harrison took place in the vestibule, which contains the automatic sliding doors leading to the customer parking lot.  *Id.* at ¶ 9.  There are many areas – inside and outside the store – where Holt and Hunter could have withdrawn. Second, Holt and Hunter could have disengaged Harrison and withdrawn after Harrison's pocketknife was pried away from her hand.  Instead, they continued to try to subdue her and forced her into the AP office.  *Id.* at ¶ 13.  Third, and perhaps most incontrovertibly, Holt and Hunter could have disengaged Harrison and withdrawn rather than forcing her into the AP office

and restraining her there against the wall for several minutes until police arrived.  *Id.* at ¶¶ 14-16.  During that time, Holt and Hunter did not know whether Harrison had any other weapons or whether she might become hostile again.  *Id.* at ¶ 17.

In sum, an examination of undisputed evidence shows that no reasonable jury could conclude that Holt and Hunter had "no opportunity to withdraw" after Harrison became hostile and threatened them with a pocketknife.  Accordingly, Holt and Hunter's claims should be dismissed as a matter of law on summary judgment.

**III.    POULSEN'S CLAIM SHOULD BE DISMISSED UNDER THE AFTER-ACQUIRED EVIDENCE DOCTRINE; IN THE ALTERNATIVE, THE DOCTRINE CAPS THE AMOUNT OF HER ALLEGED DAMAGES FOR WRONGFUL TERMINATION.[5]**

The after-acquired evidence doctrine has long applied in wrongful termination cases to preclude an employee's recovery where the employer, "during the course of discovery, discovers information which would have resulted in the employee's termination." *Calvert v. Smith's Food & Drug Ctrs., Inc.*, 2007 WL 4207198, at *7 (D.Utah Nov. 26, 2007).  Under federal anti-discrimination statutes, where an employer can "establish wrongdoing [that] was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge," then the plaintiff's back pay is capped at the date the information was discovered.  *Id.* (quoting *McKennon v. Nashville Banner Publishing Co.*, 513

---

[5]  At the November 3, 2015 status conference, the Court agreed that Walmart should have an opportunity to make any summary judgment arguments that were not asserted initially due to the fact that a self-defense public policy exception was not previously recognized in Utah.  The argument in this Section concerning the "after-acquired evidence doctrine" was not initially asserted because an alternative ground for dismissal was unnecessary given that there was no self-defense public policy exception in Utah.

U.S. 352, 360-63 (1995)) (capping damages under after-acquired evidence doctrine because plaintiff had lied about his criminal history on his employment application).

The doctrine is also widely recognized in state courts as a defense to state law wrongful termination claims. *See* Stephen J. Humes, *After-Acquired Evidence of Employee's Misconduct as Barring or Limiting Recovery in Action for Wrongful Discharge*, 34 A.L.R.5[th] 699 (1995) (noting that the doctrine "appear[s] to be gaining momentum" among state courts). Many state courts apply the doctrine more broadly than it is applied under the federal anti-discrimination statutes, such that after-acquired evidence of wrongdoing sufficient to terminate the employee will completely bar recovery for wrongful termination. *See id.* §§ 2a, 3.[6] Other state courts parallel the federal application and simply allow after-acquired evidence to limit back pay damages to the date the employer learns of the after-acquired evidence. *See id.* § 4.[7] No state, to Walmart's knowledge, has completely rejected the after-acquired evidence doctrine.[8]

Utah courts have yet to decide whether, and to what extent, the after-acquired evidence doctrine applies to wrongful termination claims. *See Pett v. Autoliv ASP, Inc.*, 106 P.3d 705, 706

---

[6] These include, among others, California (*Camp v. Jeffer, Mangels, Butler & Marmaro*, 41 Cal. Rptr. 2d 329, 335–40 (Cal. Ct. App.1995)), Nebraska (*Schuessler v. Benchmark Mktg. & Consulting*, 500 N.W.2d 529, 540 (Neb. 1993)), New Jersey (*Cedeno v. Montclair State Univ.*, 725 A.2d 38, 43–44 (N.J. Super. Ct. App. Div. 1999)) and Virginia (*Leahey v. Fed. Express Corp.*, 685 F. Supp. 127, 128 (E.D.Va. 1988)).

[7] These include, among others, Colorado (*Weissman v. Crawford Rehab. Servs.*, 914 P.2d 380, 386 (Colo. 1995)), New Hampshire (*McDill v. Environamics Corp.*, 757 A.2d 162, 166 (N.H. 2000)), and Oklahoma (*Silver v. CPC-Sherwood Manor, Inc.*, 151 P.3d 127, 130 (Okla. 2006)).

[8] The A.L.R. lists two Ohio decisions for the proposition that the after-acquired evidence rule is "not applicable" to wrongful discharge claims; however, both opinions recognize the vitality of the doctrine and hold that it simply does not apply to the facts of the case. *See O'Brien v. Ohio State Univ.*, 859 N.E.2d 607, 612 (Ohio Ct. Cl. 2006); *O'Brien v. Ohio State Univ.*, 2007 WL 2729077, at ¶¶ 81–82.

(Utah 2005) (declining to decide "the scope and application of the after-acquired evidence defense," but affirming trial court's decision to grant motion to amend answer to include the defense). This Court should accordingly make an "*Erie*-guess" as to how the Utah Supreme Court would apply the after-acquired evidence rule to wrongful discharge claims. *See Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 852 (10th Cir. 2015). In doing so, the Court should "consider all resources available" including decisions by Utah courts, other state courts, and federal courts, "in addition to the general weight and trend of authority." *Id.* (quoting *In re Dittmar*, 618 F.3d 1199, 1204 (10th Cir. 2010)).

Walmart urges the Court to apply the rule in several states in which recovery is completely barred when an employer subsequently discovers evidence of wrongdoing severe enough to warrant termination. *See, e.g.*, *Schuessler v. Benchmark Mktg. & Consulting*, 500 N.W.2d 529, 540 (Neb. 1993). Such a rule is particularly appropriate and reasonable where, as here, the plaintiff took steps to conceal the information in question from his or her employer. *Id.* ("[I]t would be absurd to hold that the employee may recover if his wrongdoing is *covert*."). Such a rule properly bars relief that a wrongful termination plaintiff is not otherwise entitled to given his or her disqualification from employment.

It is undisputed that Mr. Longton was stopped and investigated by the Layton Walmart AP associates after he had gone into the restroom with the laptop computer. SOF ¶¶ 33-44. It is also undisputed that the Layton Walmart AP associates failed to reestablish the four elements required under Policy AP-09 for conducting a stop and investigation. *Id.* APC Poulsen, who was the supervisor over the Layton Walmart APAs, admitted multiple times that it was a "bad" stop

because they "had lost the four elements." *Id.* at ¶ 36. APC Poulsen did nothing to terminate the bad stop. *Id.* at ¶ 37. APC Poulsen also admitted that she did not inform her supervisors that the stop was bad; and Poulsen even told APA Kelly Gentle to omit this critical information from her case report since it would provide grounds for termination. *Id.* at ¶¶ 39-41. Ms. Gentle's case report for the Longton apprehension does not, in fact, mention that Mr. Longton had gone into the restroom. *Id.* at ¶ 40.

Had Walmart known that Poulsen took this active role in the stop and investigation of Mr. Longton despite knowing that all four elements were not reestablished after he went into the restroom, this information would have resulted in Poulsen's termination. *Id.* at ¶¶ 43-44. Accordingly, Poulsen's claims should be completely dismissed under the after-acquired evidence doctrine. In the alternative, at a minimum, Poulsen's alleged damages for wrongful termination should be limited to the period between her termination and the time that Walmart learned she violated Policy AP-09 because the four elements were not reestablished after Mr. Longton went into the restroom.

## <u>CONCLUSION</u>

For the foregoing reasons, Walmart's Motion for Summary Judgment should be granted.

DATED:  December 3, 2015.

Respectfully submitted,

MANNING CURTIS BRADSHAW
  & BEDNAR PLLC

**/s/  Kathleen W. Toth**

_____

Kathleen W. Toth
James E. Ji

*Attorneys for Defendant Walmart Stores, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 3rd day of December, 2015, I served true and correct copies of the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** upon the following counsel of record, in the manner indicated below:

|  |  |
|---|---|
| ___Hand Delivery | Lorraine P. Brown |
| ___U.S. Mail | UTAH LEGAL ADVOCATES, LLC |
| ___Overnight Mail | P.O. Box 150848 |
| ___Fax Transmission | Ogden, UT 84415 |
| ___E-Mail Transmission | Telephone: (801) 643-3832 |
| _x_USDC ECF Transmission | Facsimile: (801) 754-8711 |
|  | Email: lbrown@utahlegaladvocates.com |


**/s/  Kathleen W. Toth**

_____